## IN THE UNITED STATES DISTRICT COURT
## FOR THE WESTERN DISTRICT OF VIRGINIA
## ROANOKE DIVISION

NICHOLAS DANIEL JOHNSON,          )
     Plaintiff,          )          Civil Action No. 7:19-cv-00005
               )
v.          )
               )          By: Michael F. Urbanski
CAPTAIN T. MCCOY, et al.,          )          Chief United States District Judge
     Defendants.          )

## MEMORANDUM OPINION

Nicholas Daniel Johnson, proceeding pro se, was in the custody of the Southwest Virginia Regional Jail Authority ("SWVRJA") for about four months beginning in November 2018, including at the time he filed suit. According to his address, he is currently in federal custody.

In his amended complaint,[1] Johnson alleges that, while housed at SWVRJA's Haysi facility, the four remaining defendants violated his constitutional rights.[2] The defendants are Captain T. McCoy, Chaplain Tim Herring, Lieutenant Hurley, and Food Service Manager Barry Viers, all of whom Johnson sues only in their individual capacities. ECF No. 22 at 3.

Pending before the court is a motion for summary judgment filed by defendants, in which they seek judgment in their favor as to all claims. ECF No. 59. The motion is fully briefed, including a sur-reply filed by Johnson, which the court has considered despite the fact

---

[1] The court construes the amended complaint as consisting of several documents received on consecutive days: ECF Nos. 22–25. To avoid confusion, the court will cite to any portion of the amended complaint using only the docket number and page number assigned by the court's CM/ECF system.

[2] Johnson's amended complaint included two other defendants identified only by a description of their position. One of those Johnson voluntarily dismissed without prejudice, ECF No. 47, and the other was not able to be identified and also was dismissed without prejudice, ECF No. 53.

that Johnson did not seek or receive permission to file it.  See ECF Nos. 65, 66, 67.  For the reasons set forth in this opinion, the court will grant defendants' motion.

## I.   BACKGROUND[3]

Johnson lists four claims in his amended complaint.  His first and third claims allege that defendants denied him the ability to freely practice his religion, Islam.  In his first, he claims that defendants McCoy and Hurley denied him a prayer rug and a Qur'an and that Chaplain Tim Herring denied him a Qur'an.  In his third claim, Johnson alleges that defendant Viers served food with pork to people with religious diets "inside a no-pork facility."  He describes only a single incident in December or January 2019, in which he alleges inmates were served barbecue baked beans, and one of the kitchen inmates told him they had pork in them. ECF No. 23-1 at 2.

Johnson's second claim alleges that McCoy and Hurley subjected him to inadequate living conditions in violation of his Eighth Amendment rights.  In introducing this claim, Johnson alleges that they deprived him of exercise and "allowed direct abuse of racism to occur" under their authority.  ECF No. 22-1 at 1.  Elsewhere in his amended complaint, he also references other conditions, such as freezing cold temperatures, the deprivation of showers for limited periods of time and other conditions that he alleges were unconstitutional.

With regard to the allegations of racism, this appears to be based primarily on Johnson's contention that other inmates, described as white supremacists, were racist and discriminated against him and other black inmates.  In addition to using offensive racial slurs, the white

---

[3]  The court will provide an overview of Johnson's claims here and will discuss additional facts in context.

inmates who were kitchen workers sometimes deprived Johnson and others of adequate food portions or put inedible items in their food.  Johnson also refers to one instance in which he says he was housed in one of the colder "end" cells when it was very cold, and staff rejected his request for a blanket.  He contends that white inmates were later in the same cell under the same circumstance, and they were given an extra blanket when they requested it.

His fourth claim alleges that defendants McCoy and Hurley did not timely respond to his grievances and that Hurley tried to persuade him to delete certain requests or grievances out of the computer.  He appears to characterize this as a due process claim.[4]  The fourth claim also lists Viers as a defendant, but does not identify any actions taken by him, and it contains allegations against dismissed defendants.

For relief, Johnson seeks damages from each defendant in specified amounts, and he also asks for injunctive relief.  Specifically,  he wants prayer rugs made available for purchase in the commissary and "alternatives for inmates who are indigent and practice Islam, including Qur'ans."  ECF No. 22-1 at 3.

## II.  DISCUSSION

### A.  Summary Judgment Standard

Under Rule 56, summary judgment is proper where "there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law."  Fed. R. Civ. P. 56(a).  A genuine issue of material fact exists only where the record, taken as a whole, could lead a reasonable jury to return a verdict in favor of the nonmoving party.  Ricci v. DeStefano,

---

[4]  In later pages, he appears to tie his rights to due process to his allegation that his legal papers were tampered with or taken.  He does not identify that any of the four remaining defendants played any role in this alleged deprivation, however, and so the court will not address this allegation further.

557 U.S. 557, 586 (2009).[5]  In making that determination, the court must take "the evidence and all reasonable inferences drawn therefrom in the light most favorable to the nonmoving party."  Henry v. Purnell, 652 F.3d 524, 531 (4th Cir. 2011) (en banc).

A party opposing summary judgment "may not rest upon the mere allegations or denials of his pleading, but . . . must set forth specific facts showing that there is a genuine issue for trial."  Anderson v. Liberty Lobby, Inc., 477 U.S. 242, 248 (1986).  Moreover, "[t]he mere existence of some alleged factual dispute between the parties will not defeat an otherwise properly supported motion for summary judgment."  Id. at 247–48.  Instead, the non-moving party must produce "significantly probative" evidence from which a reasonable jury could return a verdict in his favor.  Abcor Corp. v. AM Int'l, Inc., 916 F.2d 924, 930 (4th Cir. 1990).

The summary judgment record includes Jeannie Patrick's affidavit with exhibits and the SWVRJ inmate handbook, all submitted by defendants.  The court also treats statements made in the verified amended complaint, if based on Johnson's personal knowledge, as evidence in opposition to the summary judgment motion.  Williams v. Griffin, 952 F.2d 820, 823 (4th Cir. 1991).  Although Johnson's opposition and sur-reply are not verified, the court also treats statements therein, if made on personal knowledge and not in conflict with allegations in the complaint, as part of the summary judgment evidence.  The court presumes that Johnson would be able to testify as to those statements at any trial, even though he failed to set them forth in a sworn affidavit.

---

[5]  Internal citations, alterations, and quotation marks are omitted throughout this opinion, unless otherwise noted.  See United States v. Marshall, 872 F.3d 213, 217 n.6 (4th Cir. 2017).

## B. First Amendment Claims[6]

The First Amendment protects an individual's right to the free exercise of religion. U.S. Const. amend I. To state a claim that prison officials or regulations have violated his right to freely exercise his religion, a plaintiff must first prove that he holds a sincere religious belief, as opposed to a secular preference, Wisconsin v. Yoder, 406 U.S. 205, 215–16 (1972), and that the official action or regulation substantially burdened his exercise of that belief, Hernandez v. Comm'r, 490 U.S. 680, 699 (1989). As explained by the Fourth Circuit,

> a substantial burden is one that puts substantial pressure on an adherent to modify his behavior and to violate his beliefs, or one that forces a person to choose between following the precepts of her religion and forfeiting governmental benefits, on the one hand, and abandoning one of the precepts of her religion on the other hand.

Lovelace v. Lee, 472 F.3d 174, 187 (4th Cir. 2006).

If the plaintiff establishes a substantial burden on his sincerely held religious belief, the defendants' policy or practice can withstand a First Amendment challenge so long as it is "reasonably related to a legitimate penological interest." O'Lone v. Estate of Shabazz, 482 U.S. 342, 349 (1987) (quoting Turner v. Safley, 482 U.S. 78, 89 (1987)). This inquiry is

---

[6] The amended complaint does not specify whether the claims involving his religion are based on alleged violations of the First Amendment, the Religious Land Use and Institutionalized Persons Act ("RLUIPA"), 42 U.S.C. § 2000cc-1, et seq., or both. Defendants only address First Amendment claims, however, and the court agrees that Johnson cannot proceed under RLUIPA at this point. First of all, RLUIPA does not permit an award of damages in this context. See Sossamon v. Texas, 563 U.S. 277, 288 (2011) (holding damages are unavailable for official-capacity claims); Rendelman v. Rouse, 569 F.3d 182, 189 (4th Cir. 2009) (same for individual-capacity claims); Wall v. Wade, 741 F.3d 492, 496 n.5 (4th Cir. 2014) ("Congress did not authorize damages claims against state officials under RLUIPA."). Second, because Johnson is no longer in custody at any SWVRJ facility, any request for declaratory or injunctive relief is moot. See Rendelman, 569 F.3d at 186 (noting that "a prisoner's transfer or release from a particular prison moots his claims for injunctive and declaratory relief with respect to his incarceration there" and holding that plaintiff's claim for injunctive relief was mooted by his transfer from state to federal custody). Accordingly, the court analyzes Johnson's claims only as First Amendment claims.

governed by the four so-called Turner factors:

> (1) whether there is a "valid, rational connection" between the prison regulation or action and the interest asserted by the government, or whether this interest is "so remote as to render the policy arbitrary or irrational"; (2) whether "alternative means of exercising the right . . . remain open to prison inmates," an inquiry that asks broadly whether inmates were deprived of all forms of religious exercise or whether they were able to participate in other observances of their faith; (3) what impact the desired accommodation would have on security staff, inmates, and the allocation of prison resources; and (4) whether there exist any "obvious, easy alternatives" to the challenged regulation or action, which may suggest that it is "not reasonable, but is [instead] an exaggerated response to prison concerns."

Lovelace, 472 F.3d at 200 (quoting Turner, 482 U.S. at 89–92).  In weighing these factors, the court must avoid "the micromanagement of prisons," United States v. Stotts, 925 F.2d 83, 99 (4th Cir. 1991), and instead "accord substantial deference to the professional judgment of prison administrators," Overton v. Bazzetta, 539 U.S. 126, 132 (2003).  The inmate carries the burden of proof under the Turner analysis to disprove the validity of the prison regulation at issue.  Id.

### 1. Prayer Rug

Johnson alleges that, throughout the months he spent at Haysi, he repeatedly requested to be able to use a prayer rug.  Defendants have provided the affidavit of Patrick, who alleges that prayer rugs "are not allowed in SWVRJA's facilities due to security concerns and administrative costs associated with searching such items for all inmates that would request them."  Patrick Aff. ¶ 15, ECF No. 60-1.  Instead, each offender receives 1 towel, 1 blanket, and 2 sheets and may use either the towel, sheets, or blanket as a substitute for a prayer rug.  Id.  Patrick also states that she is "not aware of a 'prayer rug' being an absolute requirement of the Muslim faith."  Id. ¶ 16.

Johnson acknowledges that he was told he could use his issued towel or blanket on which to pray.  He says that in response, he "put in a grievance explaining to them the difference and significance of a prayer rug and why [he] need[ed] it," although he neither attaches that grievance nor explains that "difference" in his amended complaint.  ECF No. 23 at 3.  He also alleges that he spoke directly to Lt. Hurley about his request after his lawsuit was filed and he confirmed that all he needed was an extra towel.  Hurley said that he could not decide to give Johnson a towel because it was up to McCoy, who was the captain of security, and he told Johnson that McCoy was taking care of it.  Johnson also spoke with McCoy about this directly and told her the same thing, i.e., that "even an extra towel would suit [his] needs." Id. at 8.

In his opposition, Johnson clarifies that "a Muslim must make what is called [wudu][7] which is a mandatory thing" before his mandatory prayers, using water to clean the body.  Pl.'s Opp'n 2, ECF No. 65.  If you do not make wudu before you pray your prayer will not be answered." Id.  He states that once in a state of wudu he may not be in an unclean state and that he cannot use a rug or towel "for more than one action."  Id.  So, if he devotes one of his linens to the purpose of a prayer rug, he may not use that item for anything else.  He emphasizes that he was indigent while at Haysi and spent what money he had on hygiene items.  Particularly given his allegations about the cold temperatures and his need for an extra blanket, he reasons that he should not have been "forc[ed] to pick between [his] religion, personal hygiene and warmth." Id. at 3.

The court does not address the merits of Johnson's claim, however, because it

---

[7] Johnson spells the term "woodoo," but the correct spelling is wudu.

concludes that the law was not clearly established at the time of these events that requiring a prisoner to use one his issued towel, one of his sheets, or his blanket as his prayer rug would violate his First Amendment rights.  Accordingly, the court concludes that defendants are entitled to qualified immunity on this claim.

The doctrine of qualified immunity "protects government officials from liability for civil damages insofar as their conduct does not violate clearly established statutory or constitutional rights of which a reasonable person would have known." Pearson v. Callahan, 555 U.S. 223, 231 (2009).  Stated another way, "[q]ualified immunity protects officials who commit constitutional violations but who, in light of clearly established law, could reasonably believe that their actions were lawful." Booker v. S.C. Dep't of Corr., 855 F.3d 533, 537–38 (4th Cir. 2017).  The burden of proof is on the party seeking qualified immunity. Wilson v. Prince George's Cty., 893 F.3d 213, 219 (4th Cir. 2018).

In determining whether an official is entitled to summary judgment on the basis of qualified immunity, courts engage in a two-pronged inquiry. Smith v. Ray, 781 F.3d 95, 100 (4th Cir. 2015).  The first prong asks whether the facts, taken in the light most favorable to the party asserting the injury, show the defendant's conduct violated a constitutional right. Id. The second prong asks whether the right was "clearly established" at the time of the defendant's conduct. Id.  If the answer to either prong is "no," the official is entitled to qualified immunity.  The questions need not be asked in a particular order. Pearson, 555 U.S. at 236.

In this case, the court addresses the second prong.  Under this prong, an official is entitled to immunity if a reasonable official would not have understood that his or her actions

violates the plaintiff's constitutional rights. Anderson, 483 U.S. at 638–39. The court evaluates whether the right was clearly established "in light of the specific context of the case, not as a broad general proposition." Saucier v. Katz, 533 U.S. 194, 201 (2001)); see also Kisela v. Hughes, 138 S. Ct. 1148, 1152 (2018) (admonishing courts "not to define clearly established law at a high level of generality").

To be sure, it was clearly established in late 2018 and early 2019, as a broad proposition, that a prisoner has a First Amendment right to freely exercise his religion, subject to legitimate policies that satisfy Turner. But it was not clearly established that a prisoner had a First Amendment right to a prayer rug or an additional blanket or towel to use as a prayer rug, particularly when he was permitted to use any one of his issued linens for that purpose.

Notably, the court has not located any Supreme Court cases or Fourth Circuit cases before February 2019 holding prisoners have such a right, and plaintiff cites to none. Cf. Booker, 855 F.3d at 538–39 (4th Cir. 2017) (explaining that controlling authority refers to Supreme Court and controlling authority in the jurisdiction and in the absence of such decisions, the district court "may look to a consensus of cases of persuasive authority from other jurisdictions, if such exists"). Indeed, at that point in time, numerous courts had held that a prison's refusal to allow a prayer rug did not violate a Muslim prisoner's First Amendment rights. E.g., Williams v. Jackson, C/A No. 8:07-3661, 2009 WL 363450, at *9 (D.S.C. Feb. 10, 2009) (holding that requiring Muslim plaintiff to use either his towel, one of his sheets, or his blanket as a prayer rug did not violate his First Amendment rights), aff'd 349 F. App'x 867 (4th Cir.); see also Moon v. Jordan, No. 1:15-CV-167, 2017 WL 5466681, at *8 (E.D. Mo. Nov. 13, 2017) ("[Plaintiff] has no clearly established right to the Jail providing a

prayer rug and . . . the denial of a prayer rug did not preclude [the inmate's] free exercise of religion."); Riley v. Brown, No. 3:12-CV0374, 2012 WL 2131828, at *2 (W.D. La. 2012) ("Plaintiff has not demonstrated, other than in a conclusory fashion, that a prayer rug is an essential component of the practice of Islam and that his inability to use one inhibits the free practice of his religion"), report and recommendation adopted, 2012 WL 2131877 (W.D. La. June 12, 2012).

Even after the events alleged here, district courts within the Fourth Circuit are not in agreement as to whether it constitutes a First Amendment violation to deny an inmate a specially designated prayer rug. Compare, e.g., Bone El v. Solomon, No. 1:17CV445, 2020 WL 6546056, at *4–5 (M.D.N.C. Nov. 20, 2020) (granting summary judgment on claim involving prayer rug after finding no substantial burden on plaintiff's religion and citing to affidavit evidence that a prayer rug is not required for Muslim prayer) with Branham v. Trent, No. 7:19cv00520, 2020 WL 4451058, at *3 (W.D. Va. Aug. 3, 2020) (denying summary judgment where Muslim plaintiff alleged that he was deprived of a prayer rug).

Accordingly, to the extent that the denial of a prayer rug or an extra towel for that use violated Johnson's First Amendment rights, that right was not clearly established at the time. Thus, defendants are entitled to qualified immunity as to Johnson's prayer-rug claim and summary judgment in their favor is appropriate.

### 2. Qur'an

Johnson alleges that being able to pray from the Qur'an is important to his faith and, in his opposition and sur-reply, he argues that there are mandatory prayers that he must read

directly from a Qur'an.[8]  Defendants have offered undisputed testimony, however, that their policies do not prohibit any inmate from possessing a Qur'an.

In particular, Qur'ans are available for purchase at the commissary and an inmate can have one mailed to him from a family member, friend, or imam, as inmates may receive "religious publications and other materials that do not have security implications."  Patrick Aff. ¶¶ 6, 10.  Johnson acknowledges this, but complains both that the text was unavailable to indigent inmates like him, and that free copies of Bibles—but not Qur'ans—were given to indigent inmates upon request.[9]

As Patrick explains, SWVRJA does not purchase Holy Bibles or other religious texts to be given to offenders.  Instead, when SWVRJA receives donations of religious materials, they are given to offenders on request, based on availability.  Patrick Aff. ¶ 7.  However, SWVRJA "received very few, if any, donations of copies of the Qur'an."  Id. ¶ 13.

Thus, nothing in any SWVRJA policy prohibited Johnson from owning or using a Qur'an, as he admits.  It is further undisputed that Johnson could have purchased one in the commissary and could have received one from a family member or friend.  Or, if a donation were made of one to SWVRJA, he could have received a donated one.  But the undisputed testimony also reflects that, unlike Bibles, Qur'ans are not often donated to the SWVRJ and

---

[8]  Defendants are correct that Johnson may not add new claims for the first time in his summary judgment opposition.  But even if his assertion that he must read mandatory prayers directly from the Qur'an (as opposed to having those prayers written and sent by someone to him in a letter, for example), is considered, as a new claim, it is governed by the same analysis as his original claim.

[9]  His opposition also states for the first time that he was never told that family, friends, or an imam could send him a copy of the Qur'an.  But the inmate handbook, to which he had access, suggests as much in noting that books may be ordered from a publishing company.  ECF No. 66-1 at 3, 29 (discussing access to the handbook and discussing bookroom services).

so there apparently were none to give to him.  It further appears that Johnson never pursued any of these additional avenues to obtain a Qur'an; he instead repeatedly asked jail staff for one.  He argues, though, that SWVRJA should have provided him one because he was indigent.  The law, however, is to the contrary.

The mere fact that policy makes the practice of one's religion more difficult or expensive does not mean that it substantially burdens the litigant's practice of that religion. Midrash Sephardi, Inc. v. Town of Surfside, 366 F.3d 1214, 1227 (11th Cir. 2004) (explaining that a substantial burden means something more than an incidental effect or inconvenience on religious exercise); Living Water Church of God v. Charter Tp. of Meridian, 258 F. App'x 729, 739 (6th Cir. 2007) (no substantial burden occurs if the government action merely makes the "religious exercise more expensive or difficult"); see also Winder v. Maynard, 2 F. Supp. 3d 709, 715 (D. Md. 2014) (explaining that plaintiff's exercise of his religion was not substantially burdened where the food he sought could be purchased through the commissary).

As stated in a factually similar case:

> Since a Koran was essential to the Plaintiff's religious exercise, by not having it, he was suffering a detriment to his religious exercise. Moreover, had the jail provided him a Koran, it would have alleviated this void in his practice of faith. But that is not to say that, by not giving him a Koran, the jail imposed any burden upon him. If the Plaintiff suffered a hardship, it was not one created by the jail. No evidence exists that the policy not to give him a Koran prohibited him from getting a Koran on his own. In fact, Chaplain Sievers tried to assist the Plaintiff by contacting the local Imam, who unfortunately did not respond. The Plaintiff's claim merely amounts to a demand that the jail provide him a Koran. Yet, neither the Constitution nor RLUIPA place any duty on jails to provide inmates with religious materials. See [Borzych v. Frank, 439 F.3d 388, 390 (7th Cir.

12

2006)]   (the   First   Amendment   does   not   require   the
accommodation of religious practice).

Eley v. Herman, No. 1:04-CV-416, 2006 WL 1722364, at *6 (N.D. Ind. June 21, 2006); Moon

v. Jordan, No. 1:15-CV-167, 2017 WL 5466681, at *8 (E.D. Mo. Nov. 13, 2017) (holding that

"the Jail was not required to provide copies of the Qur'an" where an inmate was permitted to

have a copy brought or sent to him); see also Ouahman v. Barnes, Civil No. 11-cv-075, 2012

WL 5303292, at *4 (D.N.H. 2012) (quoting same passage from Eley, holding same, and

collecting authority stating that the First Amendment does not require prison officials to

provide free religious materials or other articles to inmates); Cruz v. Beto, 405 U.S. 319, 323

(1972) (Burger, C.J., concurring) ("There cannot possibly be any constitutional or legal

requirement that the government provide materials for every religion and sect practiced in this

diverse country.  At most, [religious] materials cannot be denied to prisoners if someone offers

to supply them.").

    Moreover, the fact that the SWVRJ has Bibles to give out because of donations, but

not Qur'ans, does not establish a First Amendment violation.  Cf. Smith v. Kyler, 295 F. App'x

479, 481 (3d Cir. 2008) ("Smith's free exercise rights were not violated by the DOC's policy

to provide Chaplains for only the largest major faith groups and to prohibit group worship in

the absence of an approved, volunteer Faith Group Leader.  The District Court correctly noted

that the DOC has a legitimate interest in managing limited financial resources and in

maintaining prison security.").

    For all of these reasons, summary judgment will be granted for defendants as to

Johnson's Qur'an claim.

### 3.  No-Pork Diet

Johnson's claim that he was served baked beans containing pork is unsupported by any competent evidence.  Patrick's affidavit avers that none of SWVRJA's facilities serve any food containing pork, and she provides food labels for the ingredients in the baked beans, which confirm that they do not contain pork.  Patrick Aff. ¶¶ 17–18 & Att. B.  The only evidence offered to contradict her testimony is Johnson's assertion that one of the trustee inmates working in the kitchen said there was pork in some of the meals.  Not only would this evidence be inadmissible hearsay in its current form, but even if that inmate offered an affidavit so stating, that testimony is flatly contradicted by the food labels provided, which Johnson does not dispute, except to say that more food labels should have been provided.[10]  Pl.'s Opp'n 8, ECF No. 65.  Accordingly, defendants are entitled to judgment in their favor as to his Johnson's claim on being served pork.

### 4.  Anti-Muslim Comments by Herring

Johnson also references anti-Muslim comments allegedly made by Chaplain Herring.  Specifically, he alleges that when a fellow Muslim inmate asked Herring for a Qur'an, Herring said "Oh, you're one of them Muslim terrorist people.  That's a false religion."  Johnson alleges that he was shocked by his unprofessional response and that his words "hurt him deeply" and continue to affect him.  He further alleged that Chaplain Herring preached about how "bad" President Obama was, that we were "lucky not to have a black president who sides with head [w]rap people," which also hurt Johnson "mentally."  ECF No. 23 at 4–5.

---

[10]  In Johnson's opposition, he adds that the same inmate told him the kitchen staff may have used a pork "substitute" on the particular date in question.  Pl.'s Opp'n 8, ECF No. 65. But again, Patrick avers that the SWVRJA is entirely a no-pork facility and there is nothing other than inadmissible hearsay to support Johnson's assertion.

If the chaplain indeed made such comments, then it is understandable that Johnson would feel offended at the insults to his religion and aspersions cast on him as a Muslim. The court in no way condones the comments allegedly made. Nonetheless, those comments do not violate Johnson's constitutional rights. First of all, comments and verbal harassment do not give rise to a constitutional violation. Henslee v. Lewis, 153 F. App'x 179, 179 (4th Cir. 2005) ("Mere threats or verbal abuse by prison officials, without more, do not state a cognizable claim under § 1983."). Moreover, although he may have been offended and hurt by the comments, Johnson offers no evidence that the comments substantially burdened his ability to practice his religion. In particular, Johnson presents no evidence to tie Herring's comments to the denial of his prayer rug request (which was policy), the denial of a Qur'an (as there is no evidence the SWVRJ had any donated copies to provide) or the alleged serving of pork (which did not occur, according to the undisputed evidence). For these reasons, no constitutional violation can be based on those comments.

### C. Conditions-of-Confinement Claim Under the Eighth Amendment

As noted, Johnson also complains about various prison conditions. The conditions he experienced and alleges were unconstitutional include: (1) very cold temperatures in his cell—which was an "end cell" and should have qualified him for an extra blanket, coupled with the denial of his requests for an extra blanket, (2) being housed in a cell where the lights did not work for an unspecified period of time, (3) being charged for an indigent kit but not being given a toothbrush or indigent kit for four days, (4) the pod being locked down on an unspecified date and the inmates not being permitted to have recreation or to shower for almost 72 hours; and (5) the pod being locked down on another occasion, which resulted in

15

inmates receiving only one shower in a seven-day span and, during the same lock-down, jail staff "turned off the sink and toilet water and took all of their books without explanation."[11]

Johnson does not describe any physical injuries as a result of any of these conditions, although he alleges that on one occasion the cold caused his feet to go "numb," he was forced to stay in his dark cell under his blanket, and he "couldn't even get out of the bed."  ECF No. 23-5 at 1.

Throughout his complaint, Johnson refers to his efforts to complain and grieve these various incidents.  He also alleges that he complained in person to Captain McCoy about both the prayer rug and the "racism within her jail."  Id. at 8.  He claims she told him to put in a kiosk request. When he said he had been doing so, but no one responded, she said she would look into it and respond.  Id.  She did not do anything about it.

The Eighth Amendment protects prisoners from cruel and unusual living conditions.  Rhodes v. Chapman, 452 U.S. 337, 347 (1981).  But "the Constitution does not mandate comfortable prisons," and conditions that are "restrictive and even harsh . . . are part of the penalty that criminal offenders pay for their offenses against society."  Id. at 347–49.

To sustain an unconstitutional conditions claim, a prisoner must show that: (1) objectively, the deprivation was sufficiently serious, in that the challenged, official acts caused denial of "the minimal civilized measure of life's necessities"; and (2) subjectively, the defendant prison officials acted with "deliberate indifference to inmate health or safety."  Farmer v. Brennan, 511 U.S. 825, 834 (1994) (citations omitted).  To satisfy the first

---

[11] Patrick denies that the water was turned off during this lock-down, but the court will treat Johnson's sworn allegation as true for purposes of summary judgment.

element, the prisoner must show "significant physical or emotional harm, or a grave risk of such harm," resulting from the challenged conditions.  Shakka v. Smith, 71 F.3d 162, 166 (4th Cir. 1995).

Johnson's complaint fails to allege facts sufficient to state an Eighth Amendment conditions claim.  He does not allege that he has suffered any physical or emotional harm as a result of any of the described conditions, aside from his feet being numb.  Nor do the facts alleged suggest that the conditions created a substantial risk of significant harm.  See Shakka, 71 F.3d at 166.

Although they are not ideal or desirable, the temporarily unpleasant conditions Johnson describes do not, without more, constitute conditions that deprived him of the "minimal civilized measure of life's necessities."  See Farmer, 511 U.S. at 834.  Indeed, other courts, including the Fourth Circuit, have held that similar conditions did not violate the Eighth Amendment.

For example, courts have held that similar (or longer) periods of time without showers are not sufficiently serious to state an Eighth Amendment living conditions claim. E.g., Davenport v. DeRobertis, 844 F.2d 1310, 1316–17 (7th Cir. 1988) (holding that allowing inmates in a segregation unit only one shower per week was "constitutionally sufficient" and did not constitute an Eighth Amendment violation); Johnson v. Fields, No. 2:14-cv-38, 2017 WL 5505991, at *10 (W.D.N.C. Nov. 16, 2017) ("Plaintiff's claim that he was denied a shower and clean clothes for twelve days is insufficient as a matter of law to maintain an Eighth Amendment claim."); Walker v. Dart, No. 09 C 1752, 2010 WL 669448, at *4 (N.D. Ill. Feb. 19, 2010) ("Being denied clean clothes for two weeks, though unpleasant, is not a

deprivation serious enough to support an Eighth Amendment claim."); Blackburn v. South Carolina, No. 0:06-2011, 2009 WL 632542, at *17 (D.S.C. Mar. 10, 2009) (concluding that ten days without a shower when first placed in a segregation unit, followed by an average of one shower per week thereafter, was not a constitutional deprivation); see also Shakka, 71 F.3d at 165 (finding no Eighth Amendment violation where prisoner was not permitted to shower for three days after feces was thrown on him because he was given materials to clean himself and his cell).

Similarly, the deprivation of a toothbrush or hygiene kit for several days does not constitute an Eighth Amendment violation. See Canterbury v. W. Reg'l Jail Auth., No. 3:18-CV-01440, 2019 WL 6545328, at *13 (S.D.W. Va. Nov. 7, 2019) (reasoning that although an extended deprivation of hygiene items that causes injury to an inmate might establish an Eighth Amendment violation, the short-term deprivation of such items—including soap and toilet paper—without any resulting injury does not), report and recommendation adopted, No. CV 3:18-1440, 2019 WL 6598349 (S.D.W. Va. Dec. 4, 2019); Binns v. Clarke, No. 7:12-cv-00162, 2012 WL 1439258, at *3 (W.D. Va. Apr. 25, 2012) (concluding that plaintiff's allegation that he was not given access to water, toilet paper, soap, toothpaste, or a toothbrush while in a "strip cell" for three days did not rise to the level of an Eighth Amendment violation); Gilland v. Owens, 718 F. Supp. 665, 685 (W.D. Tenn. 1989) (addressing claim that inmates in one part of the jail were occasionally not furnished toilet paper, towels, sheets, and blankets for seventy-two hour stays (which sometimes lasted longer) and reasoning that "[s]hort term deprivations of toilet paper ... and the like do not rise to the level of a constitutional violation").

Lastly, the cold temperatures in his cell, while no doubt uncomfortable, are insufficient to constitute an Eighth Amendment violation because they do not satisfy the objective element of an Eighth Amendment claim.  Although he points out  that numb feet is one of the first signs of hypothermia, he does not allege that he actually suffered from hypothermia or suffered any accompanying illness or injury or any lasting ill effects.  Without more, his complaint of numb feet does not give rise to an Eighth Amendment claim.  See, e.g., Canada v. Stirling, No. 5:17-cv-2785, 2018 WL 6981119, at *5 (D.S.C. Dec. 17, 2018) (recommending grant of summary judgment where plaintiff alleged an Eighth Amendment claim based on being given only shower shoes to wear and explaining that "alleged injuries of 'wet feet' and 'coldness' are not sufficiently serious to justify relief"), report and recommendation adopted, 2019 WL 132869 (D.S.C. Jan. 8, 2019); Chance v. Spears, C.A. No. 2:08-1156, 2009 WL 3768736, at *2 (S.D.W. Va. Nov. 10, 2009) ("Although plaintiff makes conclusory assertions about the potential harm that may be wrought without additional protective clothing, his allegations simply do not rise to the level of extreme deprivation necessary to state a conditions-of-confinement violation.").

Consistent with all of the foregoing authority, defendants are entitled to summary judgment as to Johnson's Eighth Amendment conditions-of-confinement claims.

### D. Due Process Claim

Johnson's amended complaint alleges he was denied "due process," although it is unclear exactly what he believes constituted a due process violation.  The court agrees with defendants that the claim seems to be based on Johnson's assertion that he did not receive timely responses to his grievances or other requests, and he does not argue to the contrary.

Those facts, however, do not state a viable due process claim because a failure to respond to a grievance does not give rise to a constitutional claim.  Booker, 855 F.3d at 541 ("[I]nmates have no constitutional entitlement or due process interest in access to a grievance procedure."); see Adams v. Rice, 40 F.3d 72, 75 (4th Cir. 1994) ("The Constitution creates no entitlement to grievance procedures or access to any such procedure voluntarily established by a state.").  Relying on Adams, district courts, including this one, have held that a prison official's failure to comply with a grievance procedure is not actionable under § 1983.  E.g., Brown v. Va. Dep't of Corr., No. 6:07-CV-33, 2009 WL 87459, at *13 (W.D. Va. Jan. 9, 2009) ("[T]here is no liability under § 1983 for a prison administrator's response to a grievance or appeal."); Oliver v. Gray, No. 7:09-CV-00004, 2009 WL 366150, at *2 (W.D. Va. Feb. 12, 2009), aff'd, 360 F. App'x 417 (4th Cir. 2010) ("Because a state grievance procedure does not confer any substantive right upon prison inmates, a prison official's failure to comply with the state's grievance procedure is not actionable under § 1983.").  Thus, any claim against defendants arising either from their participation in the grievance process or failure to respond to grievances must be dismissed.[12]

### E.  Equal Protection Claim

Defendants' motion does not refer directly to an equal protection claim, and it is unclear whether Johnson intended to assert one.  Scattered throughout his allegations, however, are assertions that he was treated differently because of his race and his religion, and

---

[12]  In his opposition, Johnson argues that he is required to exhaust in order to bring this lawsuit, but he was prevented from doing so because of defendants' failures to respond to his grievances.  Pl.'s Opp'n 10.  If defendants were seeking dismissal based on a failure to exhaust, then the alleged failure to respond would be relevant to whether he had properly exhausted.  Defendants do not rely on a failure to exhaust, however, and, as noted in the text, there is no separate, independent claim based on the failure to respond to his grievances.

defendants seek summary judgment as to all claims.  Thus, the court also addresses any potential equal protection claim, but concludes that a reasonable jury could not find in Johnson's favor as to such a claim, either.

The Equal Protection Clause provides that "[n]o State shall... deny to any person within its jurisdiction the equal protection of the laws."  U.S. Const. amend. XIV, § 1.  To prove an equal protection claim, a litigant "must first demonstrate that he has been treated differently from others with whom he is similarly situated."  Veney v. Wyche, 293 F.3d 726, 730 (4th Cir. 2002) (quoting Morrison v. Garraghty, 239 F.3d 648, 654 (4th Cir. 2001)).  Moreover, a plaintiff must set forth "specific, non-conclusory factual allegations that establish improper motive."  Williams v. Hansen, 326 F.3d 569, 584 (4th Cir. 2003).

To the extent that Johnson argues that he was denied equal protection based on his religion, he points to the fact that Bibles, but not Qur'ans, were distributed upon request.  But the undisputed evidence makes clear that Muslims and Christians are not similarly situated as to receiving copies of religious texts.  As discussed, Bibles are regularly donated, while Qur'ans are not.  No reasonable jury could conclude that an equal protection violation occurred with regard to the distribution of these texts.

There are two separate aspects to Johnson's assertions of discriminatory treatment based on race.  The first focuses on actions taken by other inmates.  The second stems from treatment by officers.

### 1.  Treatment by Other Inmates

Johnson's amended complaint alleges that many of the trustee inmates who worked in Haysi's kitchen—and who could affect the amount or quality of food served to other inmates,

including him—were members of the "local white supremacist group called 26 Brothers Forever A.B.," which he alleges stands for Aryan Brotherhood.  He alleges that these inmates would call him and other black inmates racial slurs, such as "sand n*****s," "n*****s," and "stupid coons."  ECF No. 23 at 6.

He further states that these inmates deprived him of food or would place non-edible food items, including hair and other nonedible objects in his food.  Id.  He specifically describes one incident in which his serving of potato soup had been drained, leaving only a small amount of water.  After this incident, he complained to non-defendant Officer Pravis, who responded that he did not work in the kitchen and it was "not his job."  Johnson went hungry that night and was "deeply saddened because no staff was trying to help [him] or protect [him] from this racial abuse."  Id.

In short, although Johnson alleges that other inmates took discriminatory actions against him and other black inmates, that does not support an equal protection claim against defendants.  See Woodlin v. Wolfe, No. C.A. 14-25, 2014 WL 6629739, at *5 (D. Md. Nov. 20, 2014) ("To the extent [plaintiff] experiences bigotry short of a threat to his safety, correctional officials are not required to eliminate the prejudiced views of the inmate population at large in order to avoid violating [plaintiff's] constitutional rights. Thus, the equal protection claim must be dismissed.").

## 2.  Treatment by Staff

With regard to treatment by staff, Johnson alleges that blacks are in the minority at the jails and that a number of correctional officers referred to him as the "black boy" when he first arrived.   Verbal harassment alone—even including the use of racial epithets—while

abhorrent and unprofessional, does not violate the Eighth Amendment. Henslee, 153 F. App'x at 179 (4th Cir. 2005); Morva v. Johnson, No. 7:09-cv-00515, 2011 WL 3420650, at *7 (W.D. Va. Aug. 4, 2011) (collecting authority for the proposition that "[v]erbal harassment [and] idle threats to an inmate, even to an extent that [they] cause an inmate fear or emotional anxiety," do not give rise to a due process violation or an Eighth Amendment violation). Thus, to the extent that Johnson's claims are based solely on these statements, they fail as a matter of law.

Johnson's only allegation of differential treatment—as opposed to verbal statements— by any prison official is that he was denied an extra blanket that he should have received when he was in cell 45 during excessively cold periods, and two white inmates who were later housed in the same cell received their blankets upon request. After he saw the white inmates receive an extra blanket, Johnson spoke to Hurley about how he believed this was racism against him, but Hurley responded that there are certain rules regarding who gets extra blankets. Again, it is not entirely clear from Johnson's allegations, but it appears that Hurley told him that if an inmate was in cell 45 during the winter months and the temperature dropped below a certain temperature, or if an inmate had a medical need, he could be given an extra blanket. Hurley also confirmed that Johnson should have been given an extra blanket if he had been in cell 45 and the temperatures had been low enough.

This is consistent with Patrick's affidavit, which explains that temperature checks are conducted in the pods twice daily and, in the winter months, officers also check the temperatures in the end cells. Patrick Aff. ¶¶ 6, 7. Moreover, inmates in an end cell may

receive an extra blanket if the temperature in the cell falls below 65 degrees.[13]

Johnson's equal protection claim based on the denial of the blanket fails. As was made clear by Hurley's response to Johnson when he raised the issue, it appears that Johnson should have received a blanket, assuming his cell temperature was below 65 degrees. Thus, the denial of his extra blanket cannot be considered the result of SWVRJA policy, but instead the result of the violation of a policy by the individual officers who denied him the blanket. Importantly, though, he does not allege that it was any of the four defendants who deprived him of a blanket when temperatures were cold, but gave one to a white inmate. Thus, his claims against them fail.

Johnson also does not allege that it was even the same officer(s) who denied him the blanket who gave the blanket to the two white inmates. Particularly if the incidents involved different officers, then there is not sufficient evidence from which a jury could find the differential treatment was intentional or purposeful discrimination. Similarly, the alleged references by staff members to him as the "black boy," cannot be tied to the denial of his blanket when he has not alleged that the same individual or individuals who denied him a blanket also made those statements.[14] In short, there is insufficient evidence in the record

---

[13] Although she claims that the jail is maintained at "adequate temperatures," Patrick Aff. ¶ 6, the court—as it must for summary judgment purposes—credits Johnson's allegations that the cell he was in was extremely cold for some period of time.

[14] Courts have recognized that verbal harassment may be relevant when it is coupled with differential treatment. E.g., Chappell v. Miles, No. CA 2:12-303, 2012 WL 1570020, at *5 (D.S.C. May 3, 2012) (concluding that verbal harassment of homosexual prisoner based on his sexual orientation, while not itself an equal protection violation, was "relevant to reveal the defendant's reason for physically shoving plaintiff" where plaintiff also alleged that defendant used more force against other homosexual inmates but not heterosexual inmates). Here, however, Johnson does not allege that the same officer(s) who denied him a blanket made the remarks referring to him as a "black boy." Accordingly, the verbal comments by staff do not show intentional discrimination in the denial of an extra blanket.

from which a reasonable jury could find that the denial of his blanket was purposeful or intentional discrimination.  <u>Veney</u>, 293 F.3d at 731.  His conclusory allegations that his race was the reason are insufficient.

For the foregoing reasons, to the extent plaintiff intended to bring an equal protection claim, summary judgment in defendants' favor is proper as to that claim.

### III. CONCLUSION

For the reason set forth in this opinion, the court concludes that defendants are entitled to qualified immunity as to Johnson's claims regarding a prayer rug, and that they are entitled to summary judgment as to his remaining claims, as well.  An appropriate order will be entered.

It is so **ORDERED**.

Entered:  March 23, 2021

Michael F. Urbanski
Chief U.S. District Judge
2021.03.23 15:39:08
-04'00'

Michael F. Urbanski
Chief United States District Judge